**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------------x

In re:                                                                    **FOR PUBLICATION**

LARISA MARKUS,                                      Chapter 15
Case No. 19-10096 (MG)

Debtor in a Foreign Proceeding.

-------------------------------------------------------------------------x

**MEMORANDUM OPINION AND ORDER GRANTING THE MARKUS FOREIGN**
**REPRESENTATIVE'S TURNOVER MOTION AND DENYING CROSS-MOTION TO**
**VACATE FREEZE ORDER**

*A P P E A R A N C E S :*

MARKS & SOKOLOV, LLC
*Attorneys for Yuri Vladimirovich Rozhkov in his Capacity*
*as Trustee and Foreign Representative for the Foreign Debtor Larisa Markus*
1835 Market Street, 17th Floor
Philadelphia, PA 19103
By:     Bruce S. Marks, Esq.
        Nina Farzana Khan, Esq.
                and
ARCHER & GREINER, P.C.
630 Third Avenue
New York, NY 10017
By:     Gerard DiConza, Esq.
        Lance A. Schildkraut, Esq.

LAW OFFICES OF VICTOR A. WORMS
*Attorneys for Foreign Debtor Larisa Markus*
48 Wall Street, Suite 1100
New York, NY 10005
By:     Victor A. Worms, Esq.

LAW OFFICES OF DANIEL A. SINGER PLLC
*Attorneys for LM Realty 31B, LLC; LM Realty 27D, LLC;*
*LM Realty 24C, LLC; LM Realty 23H, LLC;*
*LM Realty 20A, LLC; LM Realty 18 West, LLC;*
*The Larisa Markus Revocable Trust; The Larmar Foundation;*
*Protax Services Inc.; Protax Services Consulting, Inc.;*
*Ilya Bykov,·First Integrated Construction, Inc.; and*
*Innovative Construction Group, Inc.*
630 Third Avenue, 18th Floor
New York, New York 10017
By:     Daniel A. Singer, Esq.

1

**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**

This Opinion and Order resolves two motions for the reasons explained below. The

Foreign Representative's Emergency Motion to Enforce the Recognition Order and Entrust the

Assets of Larisa Markus Revocable Trust to the Administration of the Foreign Representative is

**GRANTED** ("Turnover Motion," ECF Doc. # 81-12); and the LM Entities and Protax Entities'

Cross-Motion to Vacate the Freezing Order is **DENIED** ("LM/Protax Cross-Motion," ECF Doc.

## 124, 125 and 126).

As part of this ruling, the Court (i) confirms the Foreign Representative's revocation of

the LM Trust on May 27, 2019, (ii) concludes that the turnover dispute can properly be resolved

on the Foreign Representative's turnover motion, rather than by requiring an adversary

proceeding, and without requiring an evidentiary hearing because there are no disputed issues of

material fact, and (iii) orders the turnover to Foreign Representative of U.K. Proceeds from the

sale of the London property (explained below) of Larissa Markus ("Markus"), the foreign debtor

in this case. The proceeds are held in New York in the accounts of the LM Trust and of 550 Park

Avenue.

## I.    BACKGROUND

The background of this chapter 15 case ("Markus Case," Case No. 19-10096 (MG)), and

in the related chapter 15 case of Foreign Economic Industrial Bank, Ltd. ("Bank Case," Case No.

16-13534 (MG)), has been described at length in several recent opinions. *See In re Foreign*

*Econ. Indus. Bank Ltd.*, Case No. 16-13534 (MG), 2019 WL 4943752 (Bankr. S.D.N.Y. Oct. 8,

2019) ("Opinion Denying Motions to Vacate Recognition"); *In re Markus*, Case No. 19-10096

(MG), 2019 WL 5257902 (Bankr. S.D.N.Y. Oct. 16, 2019) ("Opinion Imposing Sanctions on

2

Markus' Counsel"). Familiarity with those opinions is assumed. Only the facts relevant to the pending motions will be discussed in this Opinion.

On April 1, 2019, in the Markus Case, Judge Vyskocil granted the Foreign Representative's motion for recognition of a foreign main proceeding.[1] The Russian insolvency proceeding against Markus had been initiated by Bank VTB 24, a creditor of Markus, on April 19, 2016. On May 25, 2017, the Moscow Arbitrazh Court determined that there was no evidence that Markus was eligible for a restructuring of debts and that there was evidence that Markus is bankrupt and initiated a procedure to liquidate her assets. *See* Opinion Denying Motions to Vacate Recognition, at *1. By the same judgment, the Moscow Arbitrazh Court appointed the Markus Foreign Representative as Markus' financial administrator to preside over the liquidation. *Id.* One of the effects of the recognition orders in the Bank Case and in the Markus Case was to impose the automatic stay against any transfers of property of the Russian bankruptcy estates of those foreign debtors within the territorial jurisdiction of the United States.

On October 8, 2019, I denied Markus' motions to vacate the recognition orders in the Markus Case and in the Bank Case. *See* Opinion Denying Motions to Vacate Recognition. Markus, the foreign debtor in this case, is serving a long jail sentence in Russia based on her guilty plea for having embezzled approximately $2 billion from Foreign Economic Industrial Bank, Ltd. ("Bank"), the foreign debtor in the Bank Case.

Markus is alleged to have very substantial assets secreted around the world, including in the United States. The Foreign Representative has been trying to identify and locate the assets, and to recover them for the benefit of Markus' Russian bankruptcy estate. Markus, her agents and attorneys, in the U.S. and elsewhere, have resisted the Foreign Representative's efforts to

---

[1]     On February 15, 2017, in the Bank Case, Judge Vyskocil entered an order granting recognition of the foreign main proceeding. ("Bank Foreign Main Proceeding Order," *Bank Case*, ECF Doc. # 24.)

identify and recover the assets.  Some of Markus' agents have also engaged in, assisted or

facilitated a series of asset transfers designed to make it more difficult for the Foreign

Representative to recover the assets.  Most recently, the Court imposed sanctions of $1,000 per

day on Markus' counsel in this case for stonewalling in discovery, until he complies with

outstanding discovery orders.  *See* Opinion Imposing Sanctions on Markus' Counsel, at *1.

The Foreign Representative learned that Markus holds millions of dollars in assets in the

United States in the The Larisa Markus Revocable Trust ("LM Trust"), a revocable trust

established by Markus in 2011 that is governed by New York law.  The Turnover Motion

concerns the Foreign Representative's effort to recover over $5 million in proceeds from the sale

of Markus' London Property that was transferred to the LM Trust in New York.  Markus and

Ilya Bykov, a New York resident, are co-trustees of the LM Trust.  Markus also provided Bykov

with her power of attorney.  *See id.* at *2.

Bykov, in addition to holding Markus' power of attorney and being a co-trustee of the

LM Trust, is Markus' accountant.  He also operates other entities that are involved in this case

and that have resisted the Foreign Representative's turnover motion—LM Realty 31B, LLC;

LM Realty 27D, LLC; LM Realty 24C, LLC; LM Realty 23H, LLC; LM Realty 20A, LLC;

LM Realty 18 West, LLC; The Larmar Foundation; Protax Services Inc.; Protax Services

Consulting, Inc.; First Integrated Construction, Inc.; and Innovative Construction Group, Inc.

(collectively, the "LM Entities").  Bykov, the LM Trust and the LM Entities are all represented

by Daniel A. Singer, Esq. ("Singer").  Bykov, the LM Trust and the LM Entities, through Singer,

have resisted discovery in the Markus Case.  Bykov has also engaged in several ham-handed

efforts to transfer Markus' assets in the United States to make it more difficult for the Foreign

Representative to recover the property.

### A.    The Turnover Dispute

On May 20, 2019, a letter from JPC Law on behalf of Markus, revealed that Markus' real property in the U.K. was sold for $5,286,594.99 (the "U.K. Proceeds") and that the sale proceeds were transferred to the New York bank account of the LM Trust. (Turnover Motion, ECF Doc. # 81-12 at 9.) On May 24, 2019, Bykov allegedly caused $3 million of the U.K. Proceeds to be transferred from the LM Trust to the bank account of 550 Park Avenue LLC ("550 Park"), another entity owned by Markus. ("Turnover Reply," ECF Doc. # 133-2 at 11.) On May 27, 2019, upon learning of the transfer, the Foreign Representative executed a document revoking the LM Trust (the "First Revocation"). (Turnover Motion, ECF Doc. # 81-12 at 10.) The First Revocation was signed by the Foreign Representative; however, it was not witnessed. (*See* First Revocation, ECF Doc. # 81-12 at 24.)

On May 29, 2019, Judge Vyskocil entered an order (i) requiring Singer to disclose the location of the U.K. Proceeds, and (ii) prohibiting any further transfers of those proceeds. ("Markus Freeze Order," ECF Doc. # 57.) That same day Singer filed a letter stating that "monies pertaining to the sale of the referenced property in the United Kingdom are currently in the Larisa Markus Revocable Trust Account at Chase in an account titled 550 Park Avenue, LLC at Citibank." ("Singer Letter," ECF Doc. # 58.)

On July 10, 2019, the Foreign Representative filed the Turnover Motion. (Turnover Motion, ECF Doc. # 81-12 at 8.) The Foreign Representative seeks, *inter alia*, an order (a) confirming revocation of the Larisa Markus Revocable Trust, (b) confirming the reversion of the LM Trust's assets and sale proceeds from Markus' U.K. property to the Foreign Representative, and (c) authorizing the Foreign Representative to administer such assets. (*Id.* at 10.)

The Turnover Motion is supported by the declaration of Bruce S. Marks, Esq. ("Marks"),

counsel to Foreign Representative.  (*Id.* at 1.)  Marks states that he and the Bank's foreign

representative served subpoenas on the LM Entities and the LM Trust, requiring them to disclose

all of Markus' assets.  ("Marks Letter," ECF Doc. # 51-1.)  The LM Trust is a revocable trust

established by Markus on February 14, 2011 under New York law.  ("Marks Declaration," ECF

Doc. # 81-12 at 3.)  On April 15, 2011, the LM Trust was amended and Ilya Bykov and Markus

became co-trustees of the LM Trust.  (*Id.* at 5.)

On September 8, 2019, the Foreign Representative executed a second document revoking

the LM Trust ("Second Revocation").  (Second Revocation, ECF Doc. # 133-2 at 2.)  The

Second Revocation is signed by the Foreign Representative and two witnesses, Sergey S.

Sokolov and Ksenia Polyakova.[2]  (*Id.*)

The Foreign Representative submits that the LM Trust was properly revoked.  (Turnover

Reply, ECF Doc. # 133-1 at 14.)  Pursuant to the terms of the LM Trust, Markus (its Grantor)

had the "right to revoke" the LM Trust, and upon revocation, the LM Trust's assets revert to

Markus under New York law.  (Marks Declaration, ECF Doc. # 81-12 ¶ 9.)  The Foreign

Representative argues that the Court should grant the requested relief, ordering the turnover of

Markus U.S. assets to the Foreign Representative pursuant to 11 U.S.C. §§ 1507 and 1521(a).

(Turnover Motion, ECF Doc. # 81-12 ¶ 15.)

On August 23, 2019, the LM/Protax Entities filed an opposition to the Foreign

Representative's Turnover Motion and also made a cross motion seeking access to the funds held

---

[2]    While the First Revocation without witnesses was executed on May 27, 2019, and the Second Revocation with two witnesses was executed on September 8, 2019, the Court concludes that the revocation of the LM Trust was effective on May 27, 2019.  As explained below, New York law appears to have required two witness signatures, but under the facts in this case, the Court concludes that revocation dates back to the earlier May date. Substantial compliance with the requirements for revocation had already occurred, and the Second Revocation makes clear that no fraud or other suspicious circumstances attended Foreign Representative's effort to revoke the LM Trust.

in the LM Trust.  (LM/Protax Cross-Motion, ECF Doc. # 125.)  The LM/Protax Entities argued that the Foreign Representative's Turnover Motion was flawed because there has not been a Russian court determination that the assets the Foreign Representative seeks to administer are property of the Russian bankruptcy estate of Markus. (*Id.* ¶ 1.)  Further, LM/Protax Entities submit that the threshold issue regarding what constitutes property of the Russian bankruptcy estate requires a determination under Russian bankruptcy law, and no such determination has been made or recognized by this Court.  (*Id.* ¶¶ 1, 26.)  The LM/Protax Entities also argue that the Foreign Representative's Turnover Motion is procedurally defective because, they argue, turnover must be sought through an adversary proceeding under FED. R. BANKR. P. 7001(7), which they also argue would necessitate a trial.  (*Id.* ¶ 15.)

The LM/Protax Entities submit that the LM Trust revocation is defective because it was not executed in accordance with New York law, which requires trusts "to be executed before a notary in the same fashion as are conveyances of real property and also need to be signed before two witnesses."  (*Id.* ¶ 32 (citing NEW YORK ESTATES, POWERS AND TRUSTS LAW (hereinafter, "EPTL") § 7-1.17).)  The LM/Protax Entities state that the Foreign Representative's purported revocation is not acknowledged in any fashion nor are there any witnesses to the signature.  (*Id.*) The revocation is not accompanied by an affidavit or declaration attesting to the authenticity of same.  (*Id.*)  As such, even setting aside the issue whether the Foreign Representative has the power to revoke the LM Trust, the instrument itself is a nullity and must be disregarded.  (*Id.*)

The LM/Protax Entities request that the Court vacate the May 29, 2019 Freeze Order, which precluded the LM Entities and Protax Entities from transferring the U.K. Proceeds, and the July 30, 2019 Order, which precluded the transferring of any funds from the LM Trust Citibank Escrow Account.  (*Id.* ¶ 3.)  In the alternative, the LM/Protax Entities requested that the

LM Entities and Protax Entities should be permitted to be reimbursed through the LM Trust

Citibank Escrow Account for the purposes of paying reasonable legal fees and other related costs

incurred in this proceeding and in the Bank Case. (*Id.* ¶¶ 4, 35–41.)

On August 23, 2019, Victor A. Worms, Esq. ("Worms"), Markus' attorney in this chapter

15 case in her individual capacity, filed the Memorandum of Law of Markus in Opposition to

Foreign Representative's Turnover Motion.  ("Markus Turnover Opposition," ECF Doc. # 127.)

Among other things, Worms argues that the Foreign Representative "cannot obtain any turnover

and entrustment relief without an evidentiary hearing to ensure the protection of the debtor in the

Trust assets as required under Section 1522(a) of the Bankruptcy Code." (*Id.* at 1.)  Worms

submits that an evidentiary hearing is required because "this entire Chapter 15 proceeding is part

of a corrupt enterprise and, therefore, to protect the interests of Ms. Markus in the assets of the

Trust and other properties, the Bankruptcy Court, relying upon Sections 1522(a) and 1506 of the

Code, will necessarily have to deny any turnover relief to the Foreign Representative under

either Section 1521(a)(5) or Section 1521(b) of the Bankruptcy Code." (*Id.* at 14.)  Worms

alleges that this chapter 15 case is a "corrupt enterprise" because the same Russian investment

bank (A1) that he alleges is funding the expenses of this case ran advertisements in Moscow

offering rewards to anyone that could provide information leading to discovery of Markus'

assets.  (*Id.* at 14–15.)  "In other words, A1 is the boss of the Foreign Representative in this

Chapter 15 proceeding."  (*Id.* at 15.)  Worms submits that "this has turned this entire Chapter 15

proceeding into a lottery for fortune hunters and get-rich con artists."  (*Id.* at 15–16)  Using only

slightly different words, Worms' "conspiracy enterprise" theory was raised by Worms and

rejected by the Court in the Opinion Denying Motions to Vacate Recognition.[3]  Worms' style

---

[3]    *See In re Markus*, 2019 WL 4943752, at *11:

throughout these two chapter 15 cases is consistently long on inflammatory rhetoric but totally devoid of evidence.

On September 8, 2019, the Foreign Representative filed replies to Markus and the LM/Protax Entities' Opposition to his Turnover Motion.  ("Turnover Replies," ECF Doc. ## 132, 133.)  The Foreign Representative's Turnover Reply is supported by the second declaration of Sergey S. Sokolov.  ("Second Sokolov Declaration," ECF Doc. # 133-4.)  The Replies argue that the U.K. Proceeds and right to revoke the LM Trust were the Debtor's property.  (Turnover Replies, ECF Doc. # 132 at 3; ECF Doc. # 133-1 at 11–16.)  The Foreign Representative submits that he has succeeded to all of Markus' rights and property under the Russian court order declaring Markus insolvent and appointing the Foreign Representative to administer Markus' funds and assets in Russia and elsewhere.  (Turnover Reply, ECF Doc. # 133-1 at 11–13.)  Pursuant to section 1521(a)(5), or, alternatively, under section 1507 of the Bankruptcy Code, the Foreign Representative argues he should be entrusted with the administration and realization of all of Marcus' assets in the United States.  (*Id. at* at 16–19.)  Lastly, the Foreign Representative argues that no evidentiary hearing is required to determine that Markus' interests are sufficiently

---

On behalf of the Bank and Markus, Worms also argues that a basis to vacate the recognition orders is section 1506's public policy exception.  Relief under section 1506 should be "applied sparingly."  *In re ENNIA Caribe Holding N.V.*, 594 B.R. 631, 640 (Bankr. S.D.N.Y. 2018).  "The key determination is whether the procedures used in the foreign court meet our fundamental standards of fairness." *Id.* (citations omitted).  Worms fails to show that the procedures in the Russian bankruptcy court with respect to Markus and the Bank do not meet the United States' standards of fairness.  Instead, based wholly on conclusory assertions, Worms alleges that "[t]here has been an increase in the number of chapter 15 proceedings emanating from Russia because they have discovered that they can use chapter 15 to legal steal the assets of individuals who have . . . fraudulently" come to the United States to obtain recognition.  (Markus Motion to Vacate MOL, Markus *Case*, ECF Doc. # 70 at 20-21.)  This "virus of corruption . . . poses a clear danger to the integrity of the American judicial process."  (Bank Motion to Vacate MOL, *Bank Case*, ECF Doc. # 107 at 27.)  Worms offers no competent factual support for his assertions.  Because Worms offers no factual or legal support to show that the procedures that were used in Russia in the two foreign proceedings do not meet our standards of fairness, section 1506's public policy exception does not apply.

protected under section 1522(a) based on Worms' "corrupt enterprise" theory which is not supported by any evidence.  (Turnover Replies, ECF Doc. # 132 at 6; ECF Doc. # 133-1 at 17.)

The Second Sokolov Declaration submits that "Markus' Russian bankruptcy estate includes all of her assets, including property located abroad and property put into trust such as the [LM Trust]."  (Second Sokolov Declaration, ECF Doc. # 133-4 ¶ 6.)  The Second Sokolov Declaration also submits that, under Russian law, "[i]n case of insolvency of the settlor of the trust management in respect of that property shall be terminated, and that property shall be included into the insolvency estate."  (*Id.* ¶ 13 (citing Russian Civil Code, Article 1018(2)).)  "Therefore, since the Russian court rendered judgment on declaring Ms. Markus insolvent, under Russian law the LM Trust shall be terminated (revoked) and the property that was put into the LM Trust shall become part of Ms. Markus insolvency estate."  (*Id.* ¶ 14.)

On September 20, 2019, the LM/Protax Entities submitted a further opposition to the Foreign Representative's Turnover Reply.  ("LM/Protax Further Opposition," ECF Doc. # 143.)  First, the LM/Protax Entities submit the declaration of Nelly Ioranovna Kelekhsayeva ("Nelly Declaration") rebutting the Foreign Representative's assertion about what constitutes property of Markus' bankruptcy state under Russian law.  (Nelly Declaration, ECF Doc. # 153-2.)  The Nelly Declaration states that the assets of the LM Trust are not property of the Markus bankruptcy estate because the "Russian commercial court hearing the bankruptcy case in Russia" has not made a ruling that Markus' property located outside of Russia constitutes property of the bankruptcy estate.  (*Id.* Ex. 1 ¶ 4.)

The Nelly Declaration also asserts the Second Sokolov Declaration makes a false analogy between the law of trusts in the United States and in Russia, that "[t]he closest analog to the US revocable trusts found in the Russian law is contract of 'trust management' that is governed by

Articles 1012-1026 of the Civil Code."  (*Id.* ¶ 6) (citing Second Sokolov Declaration, ECF Doc. # 133-4 ¶ 10.)  The Nelly Declaration contends that Sokolov "fails to set forth in anyway whatsoever how such law is similar to the law in the United States.  Regardless . . . the issue of whether the property of the [LM Trust] constitutes property of the bankruptcy estate must first be determined by the Russian Commercial court hearing the bankruptcy case in Russia."  (Nelly Declaration, ECF Doc. # 153-2, Ex. 1 ¶ 7.)

Second, the LM/Protax Entities submit that if the Court denies the Foreign Representative's Turnover Motion, Judge Vyskocil's freeze orders must be vacated and there should be no restrictions on the use of the U.K. Proceeds and the funds in the LM Trust Citibank Escrow Account by the LM Entities and Protax Entities.[4]  (LM/Protax Further Opposition, ECF Doc. # 143-1 at 5.)  They also argue that if the Court grants the Foreign Representative's Turnover Motion, the LM/Protax Entities should be able to use the U.K. Proceeds to pay for attorneys' fees, disbursements, and the costs of discovery.  (*Id.* at 9.)

On October 3, 2019, the LM/Protax Entities submitted the supplemental declaration of Ilya Bykov ("Bykov Declaration").  (Bykov Declaration, ECF Doc. # 154.)  The Bykov Declaration was submitted "for the sole purpose of correcting a previous misstatement which had been made with respect to the ownership composition of [550 Park].  Contrary to what has previously been represented to the Court, 550 Park is not presently owned by Larisa Markus.  Since June 23, 2016, 550 Park has been owned 100% by [the Larmar Foundation]."  (*Id.* ¶ 2.)  The Bykov Declaration states that the assignment of 550 Park to the Larmar Foundation (the "Assignment") is dated "as of June 23, 2016," *but such assignment was "only just recently*

---

[4]      To be sure, if the freeze orders are lifted, all of the funds in the accounts will quickly disappear from the United States!

11

*executed by [Bykov].*"  (*Id.* ¶ 3 (emphasis added).)  The Assignment provides that it shall be effective "as of June 23, 2016."  (*Id.*)

On October 7, 2019, the Foreign Representative submitted a Sur-Reply in response to the Bykov Declaration asking this Court to strike the Bykov Declaration on grounds that it was filed "out of time" on the October 3, 2019 hearing date, in violation of the September 18, 2019 order (ECF Doc. # 142) (denying request for an extension) and Local Rule 9006-1 (requiring answering papers to be filed "so as to ensure actual receipt not later than seven days before the return date").  ("Sur-Reply," ECF Doc. # 156.)  The Foreign Representative also argues that the U.K. Proceeds belonged to Markus regardless of the 550 Park ownership, stating that "[t]he fact that [such proceeds] were deposited into the LM Trust bank account and then transferred to the 550 Park bank account does not change their owner—Markus."  (*Id.*)  The Foreign Representative argues that the U.K. Proceeds remain an asset of Markus and are subject to turnover and administration by Foreign Representative under sections 1521(a)(5) and 1507.  (*Id.*)

Finally, on October 17, 2019, Singer filed a letter reply to the Foreign Representative's Sur-Reply.  ("Letter Reply," ECF Doc. # 166.)  The Letter Reply is supported by the declaration of Ilya Bykov ("Bykov Declaration").  The Bykov Declaration provides that Bykov is "withdrawing" the assignment that he executed purporting to evidence the transfer of Markus' interest in 550 Park to the Larmar Foundation.  (*Id.*)

### B.    Overview of the LM Trust, the LM Entities and 550 Park

As already explained, Singer's clients, Bykov, the LM Trust and the LM Entities, oppose the Turnover Motion.  The LM Trust is a U.S. revocable trust formed by Markus on February 14, 2011 under New York law.  (Marks Declaration, ECF Doc. # 81-12 at 3.)  On April 15, 2011, the LM Trust was amended and Ilya Bykov and Markus became co-trustees of the LM Trust.  (*Id.* at

12

5.)  Markus' real property in the U.K. was allegedly administered by Bykov, Markus' accountant

and agent in the United States.  (*Id.* at 9.)  Upon Markus' death, but only upon her death, the

trustee is permitted to distribute the remaining principal balance to her grandson Sergey Markus

and her brother Georgy Bedzhamov.  ("Larisa Markus Revocable Trust Agreement," ECF Doc. #

81-12 at 29.)  Section Eleven of the LM Trust provides that: "The Grantor, by instrument signed,

acknowledged and delivered to the Trustee, reserves the right to revoke, or from time to time, to

amend or alter, in whole or in part, this Agreement or any Trust created hereunder.  Such

instrument or instruments of revocation, amendment or alteration shall be served upon the

Trustee, either by delivering the same to them in person or by registered mail."  (*Id.* at 43.)

Between 2008 and 2015, Markus purchased apartments in Manhattan for more than $16

million either in her own name or in the name of one of eight "LM" New York LLCs (the "LM

Realty Entities").[5]  All of the apartments were initially purchased in Markus' name but were

allegedly transferred to one of the LM Realty Entities.  (*See* "First Sokolov Declaration," ECF

Doc. # 5 ¶ 39.)  Between 2011 and 2016, Markus allegedly transferred her ownership interests in

the LM Realty Entities to the Larmar Foundation, the equivalent of a Panama trust, and to

Innovative Construction Group, Inc. ("ICG"), which is allegedly owned by the LM Trust.

(Marks Declaration, ECF Doc. # 81-12 at 3 n.2.)

Each of the LM Realty Entities has the same ownership structure: ninety-five percent

(95%) of the interests are held by the Larmar Foundation and five percent (5%) of the interests

are held by IGC.  (First Sokolov Declaration, ECF Doc. # 5, Ex. L ¶ 6.)  The Larmar Foundation

---

[5]        Specifically, LM Realty 31B, LLC, LM Realty 27D, LLC; LM Realty 24C, LLC; LM Realty 23H, LLC;
LM Realty 20A, LLC; LM Realty 18 West, LLC; LM Realty 10C, LLC; and LM Property Management LLC
(collectively, "LM Realty Entities").

was settled by Markus for the benefit of certain of her family members.  (*Id.* ¶ 7.)  Markus holds

no position with respect to the Larmar Foundation other than being settlor of the trust.  (*Id.*)

ICG is a New York corporation formed on March 16, 2004.  (*Id.* ¶ 8.)  ICG has two

shareholders: 50% of the ICG shares are owned by the LM Trust and 50% of the ICG shares are

owned by Markus in her individual capacity.  (*Id.*)  Accordingly, Markus holds a 2.5% beneficial

ownership interest in each of the LM Realty Entities.  (*Id.* ¶ 10.)  The LM/Protax Entities submit

that, contrary to the Foreign Representative's assertions, the LM Trust does not have an

ownership interest in ICG, and ICG is not an asset of the LM Trust.  (LM/Protax Opposition,

ECF Doc. # 125 at ¶ 13 (citing Bykov Declaration, ECF Doc. # 126 ¶ 5).)

First Integrated Construction, Inc. ("FIC") is a New York corporation formed on March

10, 2004.  (First Sokolov Declaration, ECF Doc. # 5, Ex. L ¶ 11.)  The sole director of FIC is

Ilya Bykov and the sole shareholder is Markus.  (*Id.*)

In addition, Markus is listed as the sole member and manager of 550 Park Avenue LLC.

("550 Park Operating Agreement," ECF Doc. # 133-3, Ex. A.)  )  On May 24, 2019, Bykov

allegedly caused $3 million of the U.K. Proceeds in the LM Trust bank account to be transferred

to the New York bank account of 550 Park.  (Turnover Reply, ECF Doc. # 133 at 10–11.)  550

Park is a limited liability company formed under the laws of Delaware.  (550 Park Operating

Agreement, ECF Doc. # 133-3, Ex. A.)

## II.    LEGAL STANDARD

### A.    Turnover of Debtor's Assets Under Bankruptcy Code Section 1521(a)

Upon an order recognizing a proceeding as a foreign main proceeding, section 1520 of

the Bankruptcy Code makes the automatic stay under section 362 applicable, staying any actions

against property of the debtor within the jurisdiction of the United States.  The statute refers to

"property of the debtor" to distinguish it from the "property of the estate" that is created under

section 541(a). In a chapter 15 case, there is no "estate"; nevertheless, section 1520(a) imposes

an automatic stay on the debtor's property located in the United States. *In re Pro-Fit Holdings

Ltd.*, 391 B.R. 850, 864 n.48 (Bankr. C.D. Cal. 2008). The most important consequence of the

applicability of section 362 is that from and after April 1, 2019, when the Markus Case was

recognized as a foreign main proceeding, *anyone* transferring Markus' property in the United

States violated the stay and *any* transfer in violation of the stay is *void*. *See In re Schwartz*, 954

F.2d 569, 571 (9th Cir. 1992) ("Our decision today clarifies this area of the law by making clear

that violations of the automatic stay are void, not voidable."); *In re Agrokor d.d.*, 591 B.R. 163,

187 (Bankr. S.D.N.Y. 2018) ("Section 1520 details the mandatory relief that is automatically

granted upon recognition of a foreign main proceeding under Chapter 15. Section 1520(a)(1)

provides that the automatic stay will apply to all the debtor's property *that is located within the

territorial jurisdiction of the United States*. The statute refers specifically to the property of the

debtor, as opposed to the property of the estate, since there is no estate in a Chapter 15 case.

Despite this difference, the automatic effect of recognition of a foreign main proceeding under

section 1520(a) is an imposition of an automatic stay on any action regarding the debtor's

property located in the United States.") (citations omitted; emphasis in original).

Section 1520(a) also applies sections 363, 549 and 552 of the Code to any transfer of a

debtor's interest in property within the United States; it allows a foreign representative to operate

a debtor's business by exercising the rights and powers of a trustee under sections 363 and 552;

and it applies section 552 to property of the debtor that is within the territorial jurisdiction of the

United States. 11 U.S.C. § 1520(a).

15

Section 1521(a) outlines the discretionary relief a court may order upon recognition. 11 U.S.C. § 1521(a). The discretion that is granted is "exceedingly broad," since a court may grant "any appropriate relief" that would further the purposes of chapter 15 and protect the debtor's assets and the interests of creditors. 8 COLLIER ON BANKRUPTCY ¶ 1521.01 (16th ed. 2019).

"Section 1521(a)(7) authorizes the court to grant to the foreign representative the sort of relief that might be available to a trustee appointed in a full bankruptcy case," including the turnover of property belonging to the debtor. *In re Inversora Eléctrica de Buenos Aires S.A.,* 560 B.R. 650, 655 (Bankr. S.D.N.Y. 2016). Section 1521(a)(7) carves out, however, avoidance powers under sections 547 and 548, which are only available to the trustee in a full case under another chapter. 8 COLLIER ON BANKRUPTCY ¶ 1521.02 (16th ed. 2019). Section 1521(a)(5) permits the delivery of assets located in the United States to a foreign representative or another person for administration or realization but stops short of allowing repatriation or distribution. 8 COLLIER ON BANKRUPTCY ¶ 1521.01 (16th ed. 2019).

As the Court explained in *In re Agrokor d.d.*:

> The Court's discretionary relief under section 1521 of the Code may either allow the foreign representative to merely administer the debtor's assets in the United States, but require that those assets remain here, or may allow the foreign representative to remove the debtor's assets from the United States. . . . Section 1521(a)(5) entrusts to the foreign representative the "administration or realization" of the debtor's assets within the United States. . . . It is not to be confused with the optional relief provided by section 1521(b), which allows the Court to "entrust the distribution" of the debtor's assets within the United States to the foreign representative. This alternative provision allows the debtor's assets to exit the United States for *distribution*.

591 B.R. at 188 (citations omitted; emphasis in original).

For example, in *In re Tri-Continental Exch. Ltd.*, 349 B.R. 627 (Bankr. E.D.Cal. 2006), the court permitted the turnover of funds to foreign representatives for administration where the

16

funds would be maintained in a deposit account within the jurisdiction of the court but could be used to fund efforts to realize additional assets.  Where assets are entrusted to the foreign representative for distribution outside the United States, section 1521(b) permits the court to do so "provided that the court is satisfied that the interests of the creditors in the United States will be sufficiently protected."  11 U.S.C. § 1521(b).  As this Court explained in *Atlas Shipping*, "sufficient protection" embodies three basic principles: "the just treatment of all holders of claims against the bankruptcy estate, the protection of U.S. claimants against prejudice and inconvenience in the processing of claims in the [foreign] proceeding, and the distribution of proceeds of the [foreign] estate substantially in accordance with the order prescribed by U.S. law."  *In re Atlas Shipping A/S*, 404 B.R. 726, 740 (Bankr. S.D.N.Y. 2009) (quoting *In re Artimm, S.r.L.*, 335 B.R. 149, 160 (Bankr. C.D.Cal. 2005)).

Section 1522(a) requires the court to ensure that the interests of creditors and interested parties, including the debtor, are "sufficiently protected," to impose conditions on any discretionary relief, including turnover under section 1521(a), and to modify or terminate discretionary relief.  *See* 11 U.S.C. § 1522(a); *see also In re Int'l Banking Corp. B.S.C.*, 439 B.R. 614, 626 (Bankr. S.D.N.Y. 2010).  "The idea underlying [section 1522] is that there should be a balance between relief that may be granted to the foreign representative and the interests of the persons that may be affected by such relief."  *See In re Int'l Banking Corp. B.S.C.*, 439 B.R. at 626.

### B.    Foreign Representative's Authority under Russian Law to Revoke the LM Trust

The Foreign Representative submitted two declarations addressing Russian law and the Foreign Representative's authority to own and control Markus' assets, including the LM Trust in the United States—(1) First Sokolov Declaration (First Sokolov Declaration, ECF Doc. # 5); and

17

(2) Second Sokolov Declaration (Second Sokolov Declaration, ECF Doc. # 133-4).  The LM Trust submitted one declaration addressing the same issues—the Nelly Declaration (Nelly Declaration, ECF Doc. # 153-1).  Civil Rule 44.1 provides, in relevant part, that "[i]n determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence.  The court's determination must be treated as a ruling on a question of law."  FED. R. CIV. P. 44.1.

The First Sokolov Declaration explains that under Russian law, all the known assets of the debtor as of the date of the court's declaration of the debtor's bankruptcy and the initiation of the liquidation constitute the bankruptcy estate.  (First Sokolov Declaration, ECF Doc. # 5 ¶ 21 (citing Russian Bankruptcy Law Articles 110, 111, and 213.26).)  And the bankruptcy estate includes all assets of the individual debtor, and any money due to the debtor and collected by the financial administrator during the course of the bankruptcy is part of the bankruptcy estate and is administered by the financial administrator.  (First Sokolov Declaration, ECF Doc. # 5 ¶ 16 (citing Russian Bankruptcy Law Articles 131 and 213.25(3)).)

The First Sokolov Declaration also submits that under Russian bankruptcy law once the debtor is declared bankrupt, the financial administrator exercises all rights with respect to the property making up the bankruptcy estate and is entitled to collect and dispose of such property for the benefit of creditors.  (First Sokolov Declaration, ECF Doc. # 5 ¶ 15 (citing Russian Bankruptcy Law Articles 213.25(5) and 213.26).)  During a debtor's insolvency proceeding, any transaction made by the debtor without the financial administrator's approval with respect to an estate asset is deemed null and void.  (First Sokolov Declaration, ECF Doc. # 5 ¶ 17 (citing Russian Bankruptcy Law Article 213.25(5)).)  The financial administrator is authorized, among

18

other things, to (a) commence and conduct court proceedings with respect to any of the debtor's pecuniary rights (including for recovery of any assets and debts due to the debtor), (b) exercise all of the debtor's corporate rights, and (c) dispose of any of the debtor's funds placed in bank accounts or deposits for the benefit of the debtor's creditors.  (First Sokolov Declaration, ECF Doc. # 5 ¶ 18 (citing Russian Bankruptcy Law Article 213.25(6)).)

The Second Sokolov Declaration expands on the explanation of Russian law.  Under Russian law, there are specific rules for liquidation of the foreign assets of an insolvent individual, including: (i) a specific order from the Russian bankruptcy court must be issued before the "trustee [can] liquidate debtor's foreign (non-Russian) property; and (ii) execution of such order and liquidation of such foreign property shall be performed under the procedural laws of the jurisdiction where that property is located.  (Second Sokolov Declaration, ECF Doc. # 133-4 ¶ 9 (citing Russian Bankruptcy Law Article 213.26(1)).)

The Second Sokolov Declaration also submits that the closest analog to the U.S. revocable trusts found in the Russian law is the contract of "trust management" that is governed by Articles 1012–1026 of the Civil Code.  (Second Sokolov Declaration, ECF Doc. # 133-4 ¶ 10.)  And enforcement of the settlor's debts against trust property shall not be allowed unless settlor of the trust becomes insolvent.  (*Id.* ¶ 13.)  If the settlor of a trust becomes insolvent, "trust management of that property shall be terminated, and that property shall be included into the insolvency estates."  (*Id.* (citing Russian Civil Code, Article 1018(2)).)

The Nelly Declaration submitted by the LM Trust disagrees with Sokolov's explanation of Russian law. The Nelly Declaration states that the assets of the LM Trust are not property of the Markus bankruptcy estate because the "Russian commercial court hearing the bankruptcy case in Russia" has not made a ruling that Markus' property located outside of Russia constitutes

property of the bankruptcy estate.  (Nelly Declaration, ECF Doc. # 153-1 ¶ 4.)  The Nelly

Declaration submits that such a ruling is required by "Russian Bankruptcy Law 213.26(1)," and

"Mr. Sokolov points to no such ruling from a Russian commercial court regarding the [LM Trust

Assets]."  (*Id.* ¶¶ 4–5.)

The Nelly Declaration rejects that analogy made in the Second Sokolov Declaration

between law of trusts in the United States and such laws in Russia, that "[t]he closest analog to

the US revocable trusts found in the Russian law is contract of 'trust management' that is

governed by Articles 1012–1026 of the Civil Code."  (Nelly Declaration, ECF Doc. # 153-1 ¶ 6

(citing Second Sokolov Declaration, ECF Doc. # 133-4 ¶ 10).)  The Nelly Declaration contends

that Sokolov "fails to set forth in anyway whatsoever how such law is similar to the law in the

United States.  Regardless . . . the issue of whether the property of the [LM Trust] constitutes

property of the bankruptcy estate must first be determined by the Russian Commercial court

hearing the bankruptcy case in Russia."  (Nelly Declaration, ECF Doc. # 153-1 ¶ 7.)

The Court concludes on the questions of Russian law, the two Sokolov Declarations

properly state Russian law on the authority granted the Foreign Representative upon the

declaration that Markus is insolvent, which occurred on May 25, 2017.[6]  As set forth in the

Sokolov declarations, the Court concludes that Russian law provides that Markus' assets both

inside and outside Russia should be collected by the Foreign Representative.  The Court also

concludes that Russian law provides the Foreign Representative with all of the powers Markus

previously had with respect to all of her property and rights, both inside of Russia and outside of

Russia, including in the United States.  This last point is particularly important with respect to

revocation of the LM Trust.  The Court concludes that as a matter of Russian law and U.S. law,

---

[6]    The Court rejects the Nelly Declaration's contrary explanation of Russian law.

the Foreign Representative required no action by this Court for him to revoke the LM Trust, so

long as he complied with New York law in revoking the New Yok law-governed revocable trust.

The Court is satisfied that Russian law, as explained by Sokolov, permitted the Foreign

Representative to exercise whatever rights Markus had with respect to the LM Trust.  In a

chapter 15 case, the Foreign Representative could exercise those same rights without first

obtaining bankruptcy court approval.

In *In re Iida*, 377 B.R. 243 (B.A.P. 9th Cir. 2007), the Ninth Circuit Bankruptcy

Appellate Panel explained:

> It is significant that the § 1509 requirement of prior permission by
> way of recognition by a bankruptcy court deals only with acts by a
> foreign representative who needs the assistance of a court in the
> United States.  Nothing in the statute requires prior judicial
> permission for acts that do not implicate matters of comity or
> cooperation by courts.  Moreover, as noted, § 1509(f) expressly
> permits a foreign representative to sue to collect or recover a claim
> that is property of the debtor without obtaining prior permission
> from a bankruptcy court.  It follows that chapter 15 does not
> constrain a foreign representative from acts that do not require
> judicial assistance.
>
> In this instance, the Foreign Representative's actions in exercising
> shareholder rights to change the directors and officers of the Hawaii
> Corporations, in circumstances in which the corporations and the
> Iidas acquiesced without questioning the Foreign Representative's
> authority, did not impel a need for judicial assistance.  Thus, even if
> chapter 15 had been in effect when the Foreign Representative
> removed and replaced the officers and directors of the Hawaii
> Corporations, there would have been no impediment imposed by
> chapter 15.

*Id.* at 258.

In the next section of this Opinion, the Court analyzes applicable New York law with

respect to revocation of the LM Trust.

### C.    Revocation of Lifetime Trust Under New York Law

Under New York law, a lifetime trust is irrevocable, unless it expressly provides that it is

revocable, and if it is, the trust may be revoked or amended in the creator's will, or by the

method set forth in EPTL § 7–1.17(b).  EPTL § 7–1.16; *see Matter of Goetz*, 793 N.Y.S.2d 318

(Surr. Ct., Westchester County 2005).  EPTL § 7-1.17(b) provides, in relevant part, that any

revocation "authorized by the trust shall be in writing and executed by the person authorized to

amend or revoke the trust, and *except as otherwise provided in the governing instrument*, shall be

acknowledged or witnessed in the manner required by paragraph (a) of this section, and shall

take effect as of the date of such execution."  EPTL § 7-1.17(b) (emphasis added).  EPTL § 7-

1.17(a) provides that "[e]very lifetime trust shall be in writing and shall be executed and

acknowledged by the person establishing such trust and, unless such person is the sole trustee, by

at least one trustee thereof, in the manner required by the laws of this state for the recording of a

conveyance of real property or, *in lieu thereof, executed in the presence of two witnesses who

shall affix their signatures to the trust instrument*."  EPTL § 7-1.17(a) (emphasis added).

If the trust specifies how amendment or revocation must be made, an amendment or

revocation will only be valid where that procedure has been followed.  *See, e.g.*, *In re Dodge's

Trust*, 250 N.E.2d 849, 854 (N.Y. 1969); *Whitehouse v. Gahn*, 922 N.Y.S.2d 546 (App. Div. 2d

Dep't 2011); *Matter of Goetz*, 793 N.Y.S.2d 318 (Surr. Ct., Westchester County 2005).

The settlor/grantor of a revocable trust can extinguish the interests of remainder

beneficiaries as they have no interest in the trust until the settlor dies and the trust becomes

irrevocable.  RESTATEMENT OF TRUSTS (3d) § 74(1)(b).  Accordingly, the trustee of a revocable

trust during the life of the settlor and income beneficiary does not even have an obligation to

inform remainder beneficiaries of the trust and/or its administration.  *Id.*  Thus, remainder

persons lack standing to object to transactions that occurred during the settlor's life.  *See Matter of Malasky*, 736 N.Y.S.2d 151 (App. Div. 3d Dep't 2002) (concluding that remainder beneficiaries of a revocable trust lacked standing to object to a post-death accounting of the trust's administration during the lifetime of the settlor-trustee); *see also Matter of Sofi*, 957 N.Y.S.2d 266 (Sur. Ct. Bronx County 2012) (stating that "where the settlor of a lifetime revocable trust is the only person who has an interest in the income and principal of the trust during his or her life, the remaindermen have no interest in the trust until the settlor dies and the trust becomes irrevocable; consequently, the remaindermen lack standing to object to any trust transaction that occurred during the settlor's life") (citing cases).

### D.   Applicability of Federal Rule of Bankruptcy Procedure 7001(1) to Turnover Motion

FED. R. BANKR. P. 7001 identifies matters that constitute adversary proceedings governed by the rules of Part VII of the Bankruptcy Rules.  *See In re MF Glob. Inc.*, 531 B.R. 424, 431 (Bankr. S.D.N.Y. 2015).  An action to recover money or property generally requires an adversary proceeding.  *See* FED. R. BANKR. P. 7001(1).  However, Rule 7001(1) provides an exception if the proceeding is brought by a trustee to compel the debtor to deliver property to the trustee. *See, e.g.*, *In re McCrory*, No. 10-36998, 2011 WL 4005455, at *3 (Bankr. N.D. Ohio Sept. 8, 2011).

Where the trustee seeks to compel the debtor to deliver property, such relief can be sought by motion.  *See* FED. R. BANKR. P. 7001, Advisory Committee Note, 1987 Amendment (stating that "[a]nother exception is added to [Rule 7001] clause (1).  A trustee may proceed by motion to recover property from the debtor."); s*ee also In re Silverman*, 603 B.R. 498, 506 (Bankr. D.N.M. 2019) (holding that the chapter 7 trustee's turnover request to debtor was properly brought by motion); *Reed v. Nathan*, 558 B.R. 800, 821 (E.D. Mich. 2016) (stating that

under Rule 7001(1), an action to recover money or property from a third party must be brought

as an adversary proceeding, and an action to recover money or property from the debtor may be

brought by motion); *In re Salahi*, Case No. 11-16621-BFK, 2012 Bankr. LEXIS 1813, at *5 n.1

(Bankr. E.D. Va. Apr. 25, 2012) (holding that "[t]he Trustee . . . is not required to bring an

adversary proceeding for the turnover of property from the Debtor"); *In re McCrory*, 2011 WL

4005455, at *3; *In re Dybalski*, 316 B.R. 312, 315 (Bankr. S.D. Ind. 2004) (stating that "while

turnover from non-debtor parties must be brought via an adversary proceeding, the Trustee is

entitled to proceed against the Debtors via motion pursuant to Fed. R. Bankr. P. 7001(1).").

### III.   DISCUSSION

#### A.   Foreign Representative Has Authority Under Russian Law to Revoke the LM Trust

Under Russian law, the LM Trust is property of Markus' Russian bankruptcy estate.  The

Foreign Representative stepped into Marcus' shoes; thus, the Foreign Representative owns and

controls all of Markus' assets in the United States.  Accordingly, the Foreign Representative had

the authority to revoke the LM Trust and administer its assets.  No order from this Court or from

the Russian court was required for the Foreign Representative to revoke the LM Trust.

Prior to her insolvency, the LM Trust was Markus' property.  The LM Trust is a U.S.

Revocable Inter Vivos Trust formed by Markus on February 14, 2011 under New York law.

(Larisa Markus Revocable Trust Agreement, ECF Doc. # 81-12 at 25.)  Under the terms of the

LM Trust, Markus was both the grantor and the trustee.  (*Id.*)

Under Russian law, all known assets of the debtor as of the date of the court's declaration

of the debtor's bankruptcy and the initiation of the liquidation constitute the bankruptcy estate.

(First Sokolov Declaration, ECF Doc. # 5 ¶ 21 (citing Russian Bankruptcy Law Articles 110,

111, and 213.26).)  Once the debtor is declared bankrupt, Russian law provides that the financial

administrator exercises all rights with respect to the property making up the bankruptcy estate

and is entitled to collect and dispose of such property for the benefit of creditors.  (First Sokolov

Declaration, ECF Doc. # 5 ¶ 15 (citing Russian Bankruptcy Law Articles 213.25(5) and

213.26).)  Thus, the LM Trust became part of Markus' Russian bankruptcy estate on May 25,

2017 when the Moscow Court declared Markus bankrupt and initiated procedures for the

liquidation of her assets.  (*See* "Insolvency Declaration," ECF Doc. # 5-7.)  As such, the Foreign

Representative had the authority to exercise all rights with respect to the property making up

Markus' bankruptcy estate, including the LM Trust.

The argument set forth in the Nelly Declaration that the LM Trust assets are not property

of Markus' bankruptcy estate because the Russian court has not made a ruling pursuant to

"Russian Bankruptcy Law 213.26(1)" that Markus' property located outside of Russia constitutes

property of the bankruptcy estate lacks merit.  (*See* Nelly Declaration, ECF Doc. # 153- 1 ¶¶ 4–

5.)  First, on May 25, 2017, the Russian court hearing the Markus' bankruptcy case made a

ruling that Markus was insolvent; at that time all known assets of Markus became property of her

bankruptcy estate.  (*See* First Sokolov Declaration, ECF Doc. # 5 ¶ 21 (citing Russian

Bankruptcy Law Articles 110, 111, and 213.26).)

Second, the Nelly Declaration confuses the Russian law regarding liquidation of foreign

assets of an insolvent individual and the Russian law establishing what constitutes property of

the bankruptcy estate.  Under Russian law, there are specific rules for liquidation of the foreign

assets of an insolvent individual, including: (i) a specific order from the Russian bankruptcy

court must be issued before the trustee can liquidate debtor's foreign (non-Russian) property; and

(ii) execution of such order and liquidation of such foreign property shall be performed under the

procedural laws of the jurisdiction where that property is located. (Second Sokolov Declaration, ECF Doc. # 133-4 ¶ 9 (citing Russian Bankruptcy Law Article 213.26(1)).) This provision of Russian law addresses the liquidation of foreign assets, not what constitutes property of the bankruptcy estate. Here, Foreign Representative seeks an order confirming the revocation of the LM Trust, confirming reversion of its assets to the Foreign Representative, and authorizing the Foreign Representative to administer its assets. At this time, the Foreign Representative is not seeking the authority to liquidate assets of the LM Trust. Russian law does not require a specific ruling from a Russian court that the LM Trust is property of Markus' bankruptcy estate.

The Second Sokolov Declaration also explains that the Foreign Representative has the authority to revoke the LM Trust under Russian law relating to trusts. (*See* Second Sokolov Declaration, Doc. # 133-4 ¶ 10.) The Second Sokolov Declaration provides that the closest analog to the U.S. revocable trusts found in the Russian law is the contract of "trust management" that is governed by Articles 1012–1026 of the Civil Code. (*Id.*) And enforcement of the settlor's debts against trust property shall not be allowed unless the settlor of the trust becomes insolvent. (*Id.* ¶ 13.) If the settlor of a trust becomes insolvent, "trust management in respect of that property shall be terminated and that property shall be included into the insolvency estate." (Second Sokolov Declaration, ECF Doc. # 133-4 ¶ 13 (citing Russian Civil Code, Article 1018(2)).)

While the Nelly Declaration rejects that analogy made in the Second Sokolov Declaration between law of trusts in the United States and such laws in Russia (*see* Nelly Declaration, ECF Doc. # 153-1 ¶ 6 (citing Second Sokolov Declaration, ECF Doc. # 133-4 ¶ 10)), the Nelly Declaration fails to set forth any provision of Russian law to the contrary or provide any legal

analysis that would cast any serious doubt on the statements made in the Second Sokolov
Declaration.

Accordingly, the LM Trust is property of Markus' Russian bankruptcy estate and Foreign
Representative had authority under Russian law to revoke the LM Trust. The LM/Protax Entities
have not submitted any serious evidence to the contrary.

**B.** **Foreign Representative Properly Revoked the LM Trust Under New York Law**

The Court concludes that the Foreign Representative complied with New York law in
exercising Markus' rights as settlor to terminate or revoke the LM Trust. The LM Trust is a New
York law-governed revocable inter vivos trust formed by Markus (settlor/grantor) on February
14, 2011. (Marks Declaration, ECF Doc. # 81-12 at ¶ 5.) Section Eleven of the LM Trust
provides that: "The Grantor, by instrument signed, acknowledged and delivered to the Trustee,
reserves the right to revoke, or from time to time, to amend or alter, in whole or in part, this
Agreement or any Trust created hereunder. Such instrument or instruments of revocation,
amendment or alteration shall be served upon the Trustee, either by delivering the same to them
in person or by registered mail." ("Larisa Marks Revocable Trust," ECF Doc. # 81-12 at 43.)
Thus, the LM Trust expressly provides that it is revocable.

Under New York law, a revocable lifetime trust is governed by EPTL § 7-1.17(b), which
provides, in relevant part, that any revocation "authorized by the trust shall be in writing and
executed by the person authorized to amend or revoke the trust, and *except as otherwise provided
in the governing instrument*, shall be acknowledged or witnessed in the manner required by
paragraph (a) of this section, and shall take effect as of the date of such execution." EPTL § 7-
1.17(b) (emphasis added). EPTL § 7-1.17(a) provides that "[e]very lifetime trust shall be in
writing and shall be executed and acknowledged by the person establishing such trust and, unless

such person is the sole trustee, by at least one trustee thereof, in the manner required by the laws of this state for the recording of a conveyance of real property or, in lieu thereof, executed in the presence of two witnesses who shall affix their signatures to the trust instrument." EPTL § 7-1.17(a).

Here, the Foreign Representative, stepping into the shoes of Markus (Grantor), revoked the LM Trust by executing a revocation document that was witnessed by two persons. (*See* Turnover Reply, ECF Doc. # 133-2 at 2.) The Foreign Representative's Second Revocation of the LM Trust complies with the requirements of the governing instrument (*see* EPTL § 7-1.17(b)) and the formal requirements of EPTL § 7-1.17(a). The LM/Protax Entities' argument that the LM Trust revocation was defective because it was not notarized lacks merit because the statute governing revocation does not require a notarized instrument. *See* EPTL § 7-1.17.

While there is no evidence submitted that the Foreign Representative served the Second Revocation on Ilya Bykov (the co-trustee) in-person or by registered mail, such failure to give notice does not affect the validity of the revocation or the date upon which same took effect. *See* EPTL § 7-1.17(b). The LM/Protax Entities also argue that the beneficiaries of the LM Trust should have been notified of the revocation. (LM/Protax Opposition, ECF Doc. # 125 ¶ 31.) This argument also lacks merit. The settlor/grantor of a revocable trust can extinguish the interests of remainder beneficiaries as they have no interest in the trust until the settlor dies and the trust becomes irrevocable. RESTATEMENT OF TRUSTS (3d) §74(1)(b). Accordingly, the trustee of a revocable trust during the life of the settlor and income beneficiary has no obligation to inform remainder beneficiaries of the trust and/or its administration. *Id.*

### C.    Rule 7001(1) Does Not Require an Adversary Proceeding for Foreign Representative to Obtain Turnover

As a threshold matter, the LM Trust was the property of Markus before its revocation by the Foreign Representative.  *See In re Rubin*, 160 B.R. 269, 275 (Bankr. S.D.N.Y. 1993) ("Under New York law, a settlor who reserves an unqualified power of revocation remains the absolute owner of the trust's corpus so far as the rights of his creditors or purchasers are concerned."). Russian law allows the Foreign Representative to step into Markus' shoes and gives the Foreign Representative ownership and control of the LM Trust.  (*See* First Sokolov Declaration, ECF Doc. # 5; Second Sokolov Declaration, ECF Doc. # 133-4.)  Thus, the Foreign Representative had authority under Russian law to revoke the LM Trust.

The Foreign Representative properly revoked the LM Trust and the LM Trust property then reverted to Markus.  *See* EPTL § 7.1-17.  As such, the Rule 7001(1) exception applies here because the Turnover Motion seeks to compel delivery of Markus' property to the Foreign Representative.  *See* FED. R. BANKR. P. 7001, Advisory Committee Note, 1987 Amendment (stating that "[a]nother exception is added to [Rule 7001] clause (1).  A trustee may proceed by motion to recover property from the debtor.")  Thus, turnover of LM Trust property from Markus to the Foreign Representative may be accomplished by motion rather than by an adversary proceeding under FED. R. BANKR. P. 7001.  *See also In re Silverman*, 603 B.R. at 506 (holding that the chapter 7 trustee's turnover request to debtor was properly brought by motion).

### D.    Section 1521(a) Permits Turnover of LM Trust Assets and U.K. Proceeds in the 550 Park Bank Account

The Foreign Representative alleges that proceeds from the sale of Markus' U.K. property, totaling approximately $5,286,594.99, were transferred to a JP Morgan Chase New York bank account of the LM Trust on March 21, 2019.  (Marks Declaration, ECF Doc. # 81-12 at ¶ 6.)  On

29

May 24, 2019, Ilya Bykov allegedly caused $3 million of the U.K. Proceeds in the LM Trust

account to be transferred to the New York bank account of 550 Park.  (Turnover Reply, ECF

Doc. # 133 at 11.)

As already explained, upon an order recognizing a proceeding as a foreign main

proceeding, section 1520 of the Bankruptcy Code makes the automatic stay under section 362

applicable with regard to a stay of actions against property of the debtor within the jurisdiction of

the United States.  Any transfer of property in violation of the automatic stay is *void* (*see In re*

*Schwartz*, 954 F.2d at 571 ("Our decision today clarifies this area of the law by making clear that

violations of the automatic stay are void, not voidable")), and a willful violation of the automatic

stay is punishable as contempt of court.[7]

As explained earlier, section 1521(a) outlines the discretionary relief a court may order

upon recognition.  11 U.S.C. § 1521(a).  Section 1521(a)(5) permits the delivery of assets located

in the United States to a foreign representative or another person for administration or realization

but stops short of allowing repatriation or distribution.  8 COLLIER ON BANKRUPTCY ¶ 1521.01

(16th ed. 2019).  "Section 1521(a)(7) authorizes the court to grant to the foreign representative

the sort of relief that might be available to a trustee appointed in a full bankruptcy case,"

---

[7]     On April 1, 2019, the Markus Case was recognized as a foreign main proceeding, triggering the automatic
stay.  Bykov transferred $3 million from the LM Trust to the bank account of 550 Park Avenue on May 24, 2019.  A
knowing violation of the automatic stay may be punished by contempt.  *See, e.g.*, *In re Harrison*, 599 B.R. 173, 183
(Bankr. N.D. Fla. 2019) ("The automatic stay of 11 U.S.C. § 362(a) is a lynchpin of bankruptcy, designed as a
reprieve to debtors that file for relief.  As its name implies, the stay is automatic.  Violations of the automatic stay
are punishable as contempt because the automatic stay is considered equivalent to a court order.  If the conduct is
willful, even if based upon advice of counsel, contempt is an appropriate remedy."); *see also* 3 COLLIER ON
BANKRUPTCY ¶ 362.12[2] (16th ed. 2019) ("A violation of the stay is punishable as contempt of court.  Most courts
will impose contempt sanctions for a knowing and willful violation of a court order, and the automatic stay is
considered as equivalent to a court order.  If the conduct is willful, even if based upon advice of counsel, contempt is
an appropriate remedy.  When a violation of the stay is inadvertent, contempt is not an appropriate remedy.
Nevertheless, the creditor has a duty to undo actions taken in violation of the automatic stay.  Failure to undo a
technical violation may elevate the violation to a willful one.").

including the turnover of property belonging to the debtor.  *In re Inversora Eléctrica de Buenos Aires S.A.,* 560 B.R. at 655; *see also In re AJW Offshore, Ltd*., 488 B.R. 551, 562 (Bankr. E.D.N.Y. 2013) ("Chapter 15 does not have a specific provision authorizing turnover under § 542 or § 543, but does have the general incorporation of powers available to a trustee under § 1521(a)(7), subject to the protection of affected interests under § 1522.").  Courts have likened the authority provided to a Foreign Representative under Sections 1521(a) and (b) to that of a trustee.  *See In re Iida*, 377 B.R. at 259 ("[T]he bankruptcy court, deciding to grant relief under §§ 1521(a) and (b), simply gives the foreign representative the green light to proceed with his or her duties as trustee, provided that United States creditors' interests are sufficiently protected. In this case, there are no United States creditors with interests to protect.").

Section 1521(a)(5) provides the Foreign Representative with the authority to administer assets of Markus in the United States.  In *In re Atlas Shipping A/S*, 404 B.R. at 739–40, this Court held that "[t]he discretion that is granted [under Section 1521] is 'exceedingly broad' since a court may grant 'any appropriate relief' that would further the purposes of chapter 15 and protect the debtor's assets and the interests of creditors."  Accordingly, Section 1521(a) allows the foreign representative to "collect property in the United States" and administer the debtor's assets.  *See id.*  For example, the Court may "entrust the foreign representatives with the administration and realization of [a fund's] assets within the territorial jurisdiction of the United States under § 1521(a)(5)" where the foreign representative did not seek to remove assets at the time and the Cayman Court gave a broad grant of authority.  *In re AJW Offshore, Ltd*., 488 B.R. at 561 n.18.

Here, there is no dispute that the U.K. Proceeds are in the 550 Park bank account within the United States.  There is *no longer any dispute* that Markus is the sole owner of 550 Park and

31

the LM Trust.[8]  Thus, the U.K. Proceeds and LM Trust assets are subject to relief provided in

section 1521(a).  Accordingly, the Court has the authority under section 1521(a) to order that the

U.K. Proceeds in the 550 Park bank account be turned over to the Foreign Representative,

subject to the protection of affected interests under section 1522(a).

Section 1522(a) requires the court to ensure that the interests of creditors and interested

parties, including the debtor, are "sufficiently protected," to impose conditions on any

discretionary relief, including turnover under section 1521(a), and to modify or terminate

discretionary relief.  *See* 11 U.S.C. § 1522(a); *see also In re Int'l Banking Corp. B.S.C.*, 439 B.R.

at 626.  "The idea underlying [§ 1522] is that there should be a balance between relief that may

be granted to the foreign representative and the interests of the persons that may be affected by

such relief."  *In re Int'l Banking Corp. B.S.C.*, 439 B.R. at 626.  Here, the Foreign Representative

seeks the turnover of the U.K. Proceeds in the bank account of 550 Park and the assets of the LM

Trust—two entities that are wholly owned by Markus.  As such, the interests of creditors or the

foreign debtor will not be prejudiced.

### E.    No Evidentiary Hearing is Required

The parties have not raised genuine issues of material fact that would require an

evidentiary hearing on the Turnover Motion, which has been properly supported by evidence.

First, Worms' argument that turnover and entrustment of the LM Trust assets to the Foreign

Representative cannot be obtained without out an evidentiary hearing to ensure the protection of

the Debtor in the LM Trust assets as required under section 1522(a) lacks merit.  Worms submits

---

[8]    As recounted earlier in this Opinion, Singer took the position on behalf of the LM/Protax Entities that
Bykov transferred 550 Park from Markus to the Lamar Foundation through an assignment dated "as of June 23,
2016," but that "assignment" *was "only just recently executed by [Bykov]*."  (Bykov Declaration, ECF Doc. # 154. ¶
3 (emphasis added).)  The "assignment" has now been "withdrawn."  (*Id.*)

that an evidentiary hearing is required because "this entire Chapter 15 proceeding is part of a corrupt enterprise" and the Court must deny any turnover relief to the Foreign Representative. (Markus Turnover Opposition, ECF Doc. # 127 at 17.)  The Court has already rejected that argument as it based solely on Worms' overblown rhetoric and absolutely no evidence.  Section 1522 requires the Court to ensure that the interests of creditors and interested parties, including the debtor, are "sufficiently protected," to impose conditions on any discretionary relief, including entrustment under section 1521(a), and to modify or terminate discretionary relief.  *See* 11 U.S.C. § 1522(a); *see also In re Int'l Banking Corp. B.S.C.*, 439 B.R. at 626.  Worms has not submitted evidence suggesting that the interests of Markus are not sufficiently protected.

The only evidence that Worms provides of the alleged "corrupt enterprise" is the image of a billboard in Moscow and the website of A1 (Russian investment bank) describing its operations.  (Markus Turnover Opposition, ECF Doc. # 127 at 18.)  Such "evidence" is not supported by any declaration from Worms or otherwise.  Worms poses the question: "[w]ho is this A1 and why is it posting digital billboards and running advertisements seeking information on the assets of Ms. Markus and offering rewards for that information?"  (*Id.*)  Worms rhetorical question and image of the billboard in Moscow do not seriously substantiate the allegation that this chapter 15 case is a "corrupt enterprise" and "lottery for fortune hunters and get-rich con artists."  (*Id.* at 17–19)  Worms does not dispute that Markus embezzled over $2 billion from Foreign Economic Industrial Bank, Ltd.  While perhaps unorthodox to post a digital billboard seeking information about the whereabouts of the missing $2 billion, it is hardly evidence of a "corrupt enterprise."  It may be more convenient to Markus and Worms if the missing funds cannot be found, but Worms "doth protest too much, methinks."  William Shakespeare, HAMLET (quoting the line spoken by Queen Gertrude in response to the insincere overacting of

a character in the play within a play created by Prince Hamlet to prove his uncle's guilt in the murder of his father, the King of Denmark). Thus, Worms' "corrupt enterprise" allegation does not raise a serious factual dispute regarding the Turnover Motion.

Further, the dispute between Foreign Representative and the LM/Protax Entities regarding the ownership of Innovative Construction Group, Inc. (ICG) is not material to the turnover of the U.K. Proceeds in the 550 Park bank account. (*See* LM/Protax Opposition, ECF Doc. # 125 at ¶ 13 (citing Bykov Declaration, ECF Doc. # 126 ¶ 5).) Whether or not the LM Trust owns 50% of the ICG shares has no bearing on Markus' interest in 550 Park. It is now undisputed that 550 Park is wholly owned by Markus. (*See* 550 Park Operating Agreement, ECF Doc. # 133-3.)

Finally, the LM/Protax Entities have withdrawn the Bykov Declaration regarding the "as of June 23, 2016" assignment of 550 Park to the Larmar Foundation. (*See* Letter Reply, ECF Doc. # 166.) Bykov is obviously willing to go to almost any length to try to insulate Markus' assets—now properly controlled by the Foreign Representative—from her Russian bankruptcy estate.[9] As such, the U.K. Proceeds remain an asset of Markus.

## IV.    <u>CONCLUSION</u>

The foreign debtor, Larisa Markus, is serving a long jail sentence in Russia based on her guilty plea for having embezzled approximately $2 billion from Foreign Economic Industrial Bank, Ltd. ("Bank"). Markus has held millions in assets in the United States in the "LM Trust," a revocable trust established by Markus that is governed by New York law. Ilya Bykov has assisted Markus' attempts to conceal her assets, including assets in the LM Trust. The Foreign

---

[9]    Bykov has so far also significantly thwarted the Foreign Representative's discovery efforts in this case. Bykov and his counsel are forewarned that the Court will not tolerate Bykov's efforts to prevent a full judicial accounting for Markus' assets both in the United States and elsewhere.

Representative succeeded to all of Markus' rights and powers with respect to her property in the territorial jurisdiction of the United States.  It is now time to bring this charade to an end, starting with the turnover of property in the LM Trust, now properly revoked by the Foreign Representative.  For the reasons explained above, the Foreign Representative's Emergency Motion to Enforce the Recognition Order and Entrust the Assets of Larisa Markus Revocable Trust to the Administration of the Foreign Representative is **GRANTED**.  To be clear, at this stage of the proceedings, the Court is ordering turnover of all property pursuant to section 1521(a)(5), meaning that all of the property or funds turned over to the Foreign Representative must remain within the United States pending any further relief granted by this Court.[10]

For the same reasons, the LM Entities and Protax Entities' Cross-Motion to Vacate the Freeze Order is **DENIED.**

The turnover of all property covered by this Opinion shall be completed within 14 days from the date of this Opinion and Order.  Counsel for the Foreign Representative shall file weekly status reports with the Court discussing the parties' compliance with this Order until all property has been turned over to the Foreign Representative.

---

[10]     As discussed above, the Court explained in *In re Agrokor d.d.*:

> The Court's discretionary relief under section 1521 of the Code may either allow the foreign representative to merely administer the debtor's assets in the United States, but require that those assets remain here, or may allow the foreign representative to remove the debtor's assets from the United States.  Section 1521(a)(5) . . . entrusts to the foreign representative the "administration or realization" of the debtor's assets within the United States. . . .  It is not to be confused with the optional relief provided by section 1521(b), which allows the Court to "entrust the distribution" of the debtor's assets within the United States to the foreign representative.  This alternative provision allows the debtor's assets to exit the United States for *distribution*.

591 B.R. at 188 (citations omitted).

**IT IS SO ORDERED.**

Dated:    October 23, 2019
          New York, New York

                                        *Martin Glenn*
                                        MARTIN GLENN
                                United States Bankruptcy Judge